537 P.2d 994

**Lenard F. GEILER, Appellant,**

v.

**The ARIZONA BANK, Appellee.**

**Lenard F. GEILER, Appellant,**

v.

**Stan A. TANNER et ux., Compass Realty and Investment Corporation, Michael S. Tanner, et ux., Jennifer Day Enterprises, Inc., and United Ranches Corporation, Appellees.**

**Nos. I CA–CIV 2235, I CA–CIV 2251.**

Court of Appeals of Arizona,
Division 1,
Department C.
July 17, 1975.

Johansson & Sanders, Ltd. by Filipe K. Johansson, Robert H. Sanders, Lewis & Roca by John P. Frank, Kimball J. Corson, Phoenix, for appellant.

Ryley, Carlock & Ralston by John C. Ellinwood, Phoenix, for appellee, The Arizona Bank.

Philip T. Goldstein, Ltd. by Philip T. Goldstein, Phoenix, for appellees, Stan A. Tanner, and others, Compass Realty and Investment Corp., Michael S. Tanner, and others, Jennifer Day Enterprises, Inc. and United Ranches Corp.

## OPINION

NELSON, Presiding Judge.

This is an action for breach of the Arizona Securities Statutes, the Federal Securities Statutes and Regulations, and for common law fraud. The action arises out of the sale of a Nevada ranch which was to be accomplished by an exchange of stock and a cash payment. The appellant, Lenard F. Geiler (Geiler), initiated this action against S. A. Tanner (Tanner), and his wife; his son, Michael S. Tanner and wife, his brother, M. J. Tanner and wife; Eugene Redfern (Redfern), a former branch manager of the Arizona Bank and his wife; The Arizona Bank (Bank); and Joseph Raineri, Sr. (Raineri), the then lawyer for Tanner, his son, and several of the corporations controlled or used by Tanner in the alleged transaction. The essential allegations of the lawsuit are that Tanner, with the active aid of his lawyer, Rai-

neri, and his banker, Redfern, defrauded Geiler by swindling him out of his Nevada ranch, valued from $500,000 to $750,000 in the record, leaving him with $20,000 in cash and two different blocks of allegedly worthless stock.

## THE PROCEEDINGS IN THE TRIAL COURT

The initial complaint was filed on June 10, 1970. Subsequent to this usual start, there was a series of motions to dismiss, for more definite statement, for entry of default, for compelling answers to interrogatories, and for summary judgment. Interspersed with these pleadings were answers, an amended complaint and amended answers. The matter proceeded in a halting fashion through these and other proceedings until some two years later summary judgments were granted and entered in favor of Tanner, his wife, Compass Realty and Investment Corporation, Michael S. Tanner (son), Jennifer Day Enterprises, Inc., and United Ranches Corporation, as to Count II only of the four count complaint; and as to Eugene E. Redfern, and his wife, and the Arizona Bank as to all counts contained in the complaint. These judgments were entered as final pursuant to Rule 54(b), Ariz.R.Civ. P., 16 A.R.S. While summary judgment was also granted Raineri by minute entry, no judgment was entered thereon and that matter is part of the action still pending in the trial court. Rule 54(b), supra.

The appealable summary judgments were entered at three different times and two separate notices of appeal were filed. All matters were consolidated in this Court and a single set of briefs and one consolidated oral argument held.

## PRELIMINARY MATTERS

### I

## COUNT IV AS TO REDFERNS AND THE ARIZONA BANK

■ Geiler advanced no argument whatsoever in his brief or oral argument regarding Count IV of the complaint, which alleges violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78j, and Rule X–10B–5 of the Securities and Exchange Commission, 17 C.F.R. § 240.10b–5. as it might relate to Redfern and The Arizona Bank. None of the questions presented "fairly comprise" this count, Rule 5(b)(7), Rules of the Arizona Supreme Court, 17A A.R.S., and it was therefore not considered or reviewed by the Court. *Glenn v. Chenoweth,* 71 Ariz. 271, 226 P.2d 165 (1951).

### II

## FAILURE OF REDFERNS TO FILE BRIEF OR PRESENT ARGUMENT IN THIS COURT

■ Where debatable issues are raised on appeal (see: Summary Judgment and substantive matters, infra), failure to file a brief generally constitutes a confession of reversible error. *Town of Cottonwood v. Evans,* 13 Ariz.App. 595, 480 P.2d 16 (1971); *Tiller v. Tiller,* 98 Ariz. 156, 402 P.2d 573 (1965). In view of the necessity to fully review the record to determine the propriety of summary judgment, and in view of the potential liability of The Arizona Bank resting solely on the alleged conduct of Redfern, the cause is reversed as to Redfern on the merits of the issues before the Court, as well as for his failure to file briefs and otherwise participate in the action here.

## SUMMARY JUDGMENT

■ After spending the better part of several months viewing and reviewing the voluminous record before the Court, including the pleadings, memoranda, interrogatories, numerous depositions and almost innumerable exhibits, it is our opinion that this is a classic example of litigation unsuited for summary resolution. While there may be some agreement as to the general transaction, i. e., the sale of a ranch, there is great dispute as to everything else—who was involved, the level of

their involvement, the reasons for their involvement, and perhaps most importantly, their mental state and knowledge regarding the key issues of fraud and misrepresentation and the status of the stock involved in the transactions. Summary judgment is rarely appropriate in cases where state of mind is a key issue. *Peterson v. Valley National Bank,* 90 Ariz. 361, 368 P.2d 317 (1962); *Reidy v. Almich,* 4 Ariz.App. 144, 418 P.2d 390 (1966); *In re Estate of Sherer,* 10 Ariz.App. 31, 455 P.2d 480 (1969). See also: *Ong Hing v. Arizona Harness Raceway, Inc.,* 10 Ariz.App. 380, 459 P.2d 107 (1969).

▉ The general law on summary judgment hardly needs citations. Summary judgment should not be granted if, upon an examination of the entire record, it is determined that there are any disputed facts which, if found to be true by the trier of fact, could affect the final judgment. Where summary judgment has been granted by the trial court, the reviewing court must view the evidence in a light most favorable to the losing party and give such party the benefit of all the evidence and all favorable inferences that may be reasonably drawn therefrom. *Lundy v. Prescott Valley, Inc.,* 110 Ariz. 362, 519 P. 2d 61 (1974); *Dutch Inns of America, Inc. v. Horizon Corporation,* 18 Ariz.App. 116, 500 P.2d 901 (1972); *Livingston v. Citizen's Utility, Inc.,* 107 Ariz. 62, 481 P.2d 855 (1971); *Serna v. Statewide Contractors, Inc.,* 6 Ariz.App. 12, 429 P.2d 504 (1967); *Cummings v. Prater,* 95 Ariz. 20, 386 P.2d 27 (1963). Litigants are entitled to a trial where there is the slightest doubt as to the essential facts. *Livingston v. Citizen's Utility, Inc.,* supra.

In the remainder of this opinion, we set forth the facts in this light. By so doing, this Court expresses no opinion whatsoever as to what ultimate facts might be found by the appropriate trier of fact, be it a jury or the court sitting without a jury. It is entirely possible that a fact finder might conclude that this transaction was concluded without any fraud, misrepresentation, or culpability whatsoever. As will be shown, however, the opposite conclusion is also possible, thus making summary judgment inappropriate.

## SUBSTANTIVE MATTERS

In December of 1968 Geiler entered negotiations with United Equities Inc., of which Tanner was general manager. Geiler was interested in selling and United Equities, Inc. was interested in purchasing the Cherry Creek Ranch, situated in White Pine County near Ely, Nevada. The parties reached an agreement whereby Geiler was to incorporate the Cherry Creek Ranch and thereafter exchange all the stock of the newly-formed corporation for approximately $50,000 in cash and 45,000 shares of United Equities stock. Pursuant to their agreement a Nevada corporation, United Ranches, Inc. was formed by Tanner's Nevada lawyer with the Cherry Creek Ranch as its sole asset. An escrow was established by an oral agreement between the parties, but Geiler subsequently terminated that escrow when United Equities failed to deposit the $50,000 cash amount with the escrow agent. Another escrow was established in January, 1969, but that was also subsequently terminated by Geiler when the purchaser failed to deposit the requisite cash with the escrow agent.

Negotiations for the sale of the Cherry Creek Ranch were renewed in the ensuing months. At this stage, however, Tanner proposed to purchase the ranch for himself and not for or through United Equities, Inc. The parties reached an agreement and an escrow was established with Tanner's attorney, Joseph C. Raineri, Sr., on or about March 31, 1969, on the following terms: in exchange for 100% of his United Ranches stock, Geiler was to receive $20,000 in cash immediately, $30,000 in cash within six months, and 45,000 shares of United Equities stock. Both parties deposited numerous documents pursuant to the agreed-upon escrow instructions, but Tanner failed to deposit the initial $20,000

in cash. On or about May 13 or 14, 1969, Raineri notified Geiler and Tanner that he did not wish to continue as escrow agent in their transaction as he felt that his facilities for safe-keeping the parties' important documents, particularly the stock certificates, were inadequate. Thereupon the Raineri escrow was terminated and the parties, at Tanner's suggestion, proceeded to the Arizona Bank, 7th Street and McDowell branch, in anticipation of reviving the escrow with a new agent. The branch manager, Mr. Eugene Redfern, agreed to hold the documents for the parties. Among the documents submitted to Redfern by the parties was Tanner's promissory note for the $30,000 due within six months in accord with the Raineri instructions. Tanner also deposited with Redfern 10,000 shares of Delta Corporation stock to secure his promissory note. At or about the same time, in an apparent departure from the Raineri instructions, Geiler received from Redfern a cashier's check for the initial $20,000 and the 45,000 shares of unregistered United Equities investment stock to be delivered to a transfer agent in order to change the name of the certificate owner.

After more than six months had elapsed from the establishment of the Raineri escrow, Geiler sought unsuccessfully to obtain the yet unpaid $30,000 from Tanner. Failing to exact satisfaction from Tanner, Geiler demanded and received the 10,000 shares of Delta Corporation stock from Redfern. Geiler thereafter discovered that the value of the Delta stock was grossly inadequate as security for the $30,000 debt, and that the unregistered United Equities stock had a severely restricted market as well as a limited value. Unable to rescind the agreement with Tanner, Geiler acquired legal counsel and initiated this action.

Viewing the evidence in a light most favorable to Geiler, we now look at the specific defendants and the issues applicable to each of them.

## REDFERN and THE ARIZONA BANK

■ Summary judgment was rendered in favor of Redfern and the Bank on all counts of the complaint. Except for the resolution of Count IV, supra, the remaining counts (I, II and III) could be resolved against Redfern, and through him, the Bank.

At the risk of being redundant, we again emphasize that this Court makes no resolution of the ultimate facts. Redfern may well be found to have been a total stranger to this transaction, who did nothing more than accommodate Geiler and Tanner at the end of a long period of negotiations so as to finalize a sale already settled upon in each and every detail.

There are, however, in our view of this voluminous record, testimony, documents, and inferences from which this picture might be painted: Tanner, with the aid of his family, multiple corporations which he controlled, either directly or indirectly, a very resourceful lawyer, Raineri, a bank manager with a very respected financial institution, and inside information regarding Geiler's financial needs and concerns, carefully orchestrated a scheme whereby he was able to acquire a piece of property worth $750,000 for $20,000 in cash, two blocks of potentially worthless stock, and a loan from his brother for some $70,000 or so. During the course of the transaction Tanner led Geiler through a series of escrows and financial crises, making various and sundry representations concerning how the transaction was to close, the value of the various stock, its possible registration, which corporation it was actually the stock of, the availability of the needed $50,000 in cash, and other sundry items to keep Geiler on the hook and anticipating an immediate resolution of his own financial woes.

The final and most important steps in solidifying the representations of the value of the worthless United Equities, Inc. stock involves a respected lawyer and, through its branch manager, a very respected bank. Having strung Geiler along as far as pos-

sible, now having reduced the down payment to $20,000 in cash and a 6-months note for the $30,000, secured by a block of stock of another corporation, also valueless, the now escrow agent Raineri claims not to be able to continue because of lack of secure storage facilities for the allegedly very valuable documents, particularly the stock certificates.

Enter the Arizona Bank, through its Branch Manager, Redfern. There is credible evidence to find that Redfern was involved with Tanner in the overall scheme long before the fateful day in May of 1969 when Geiler and Tanner made the apparently innocent trip from Raineri's office to the Arizona Bank Branch at 7th Street and McDowell in Phoenix. Depositions of Geiler, Tanner, Redfern and William Campbell, Manager of a Valley Bank branch where Redfern negotiated a loan with stock he got from Tanner, the proceeds of which went to pay Geiler the only money he ever got out of this transaction, and all the documents, interrogatories and affidavits in the file, show that Redfern may have been the key to the whole scheme. His ability to obtain the $20,000, his presence, his bank's apparent participation, his acquiescence and obeisance to Tanner at every turn, his prolonging of Geiler's anticipation that the transaction was a proper one from May of 1969 to November of 1969, his subsequent termination by the bank, and his immediate association with Tanner in Tanner's corporate and family affairs regarding the transference and attempted insulation of the title to the Cherry Creek Ranch property—all point to such a possible conclusion.

From this picture of the chain of events comes the factual portion for all three remaining counts of Geiler's complaint. As to the common law count, the evidence can be viewed to show: (1) a representation (the value of the stock); (2) its falsity (it was worthless); (3) its materiality (no transaction without $450,000 worth of stock); (4) the speakers' knowledge of its falsity or ignorance of its truth (Tanner, Raineri and Redfern all knew it was worthless); (5) their intent that the false information be acted upon by Geiler and in the manner reasonably contemplated (Geiler would complete the transaction and remain ignorant of his problem until it was too late); (6) the hearer's (Geiler's) ignorance of its falsity (he believed them all as to value and registration); (7) his reliance on its truth (he parted with his ranch for $20,000 cash and these promises); (8) his right to rely thereon (his association with Tanner coupled with the two prominent and allegedly disinterested professionals); and (9) his consequent and proximate injury (the loss of some $480,000 of equity in his ranch property). See: *Moore v. Meyers,* 31 Ariz. 347, 253 P. 626 (1927). To be sure, each element is disputed, particularly items 6, 7 and 8, but we view the record in a light most favorable to Geiler. Each element could be found as well as not found.

This is also the case regarding Count II (sale of unregistered securities in violation of A.R.S. § 44–1841[1]), and Count III (fraud in sale of securities in violation of A.R.S. § 44–1991[2]). It is apparently undisputed that the securities in question were not registered. Whether Geiler knew this,

---

[1]. § 44–1841. Sale of unregistered securities prohibited.

A. It is unlawful to sell or offer for sale within or from this state any securities unless such securities have been registered by description under §§ 44–1871 through 44–1875 or registered by qualification under §§ 44–1891 through 44–1900, except securities exempt under § 44–1843 or securities sold in exempt transactions under § 44–1844.

B. A person violating this section is guilty of a felony punishable as prescribed by subsection A of § 44–2036.

[2]. § 44–1991. Fraud in purchase or sale of securities.

It is a fraudulent practice and unlawful for a person, in connection with a transaction or transactions within or from this state involving an offer to sell or buy securities, or a

or was led to believe they would be registered at the appropriate time, or whether they were exempt, A.R.S. § 44-1841, supra, and citations therein, are disputed and unresolved. It is also sharply disputed as to whether Tanner, Raineri, Redfern, or any of them made "any untrue statement of material fact, or omit[ted] to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.", in violation of A.R.S. § 44-1991, supra, as well as whether that, or any other violation of § 44-1991 was made and if made, attributable to any or all of the appellees.

The resolution of this action against Redfern and the Bank depends upon the level of culpability of Redfern found by the trier of fact, as well as the resolution of Geiler's right to rely on Redfern, regardless of his culpability. If in fact Redfern was a full partner in Tanner's efforts to defraud Geiler and his position of authority with the bank and his actual and apparent authority because of such a position were properly and materially relied upon by Geiler in parting with his property, the bank may well be liable on basic agency principles. *Restatement (Second) of Agency,* § 271; *Hughes v. The Riggs Bank,* 29 Ariz. 44, 239 P. 297 (1925). See also: *Oppenheimer v. Harriman National Bank & Trust Co.,* 301 U.S. 206, 57 S.Ct. 719, 81 L.Ed. 1042 (1937); *Nat'l Bank v. Whitney,* 181 Cal. 202, 183 P. 789 (1919);

*Frederic A. Potts & Co. v. LaFayette Nat'l Bank,* 269 N.Y. 181, 199 N.E. 50 (1935). While the bank makes much of cases finding no liability in securities transactions where one does not receive any of the consideration and was not a party (e. g., *Trump v. Badet,* 84 Ariz. 319, 327 P.2d 1001 (1958), this argument fails to take into consideration the possible fact that Redfern was in fact a party and/or did, or was intended to receive consideration as a result of the transactions, which the bank might be vicariously responsible for, supra.

While the trial court did not specify, we assume that, as to Counts II and III, he may have granted summary judgment to Redfern and the Bank on the basis of the statute of limitations (A.R.S. § 44-2004[3]). Since we resolve this issue against Redfern and the Bank on the same basis we resolve the issue against Tanner, his family and his corporations, infra, we will not repeat the discussion here.

## STATUTE OF LIMITATIONS— COUNT II AS TO TANNER, HIS FAMILY, AND HIS CORPORATIONS, AND COUNTS II and III AS TO REDFERN AND THE BANK

■ The applicable statute of limitations is either one year from the date of the violation as to Count II (A.R.S. § 44-2004(A), supra) or one year after the actual discovery of the fraudulent practice,

sale or purchase of securities, including securities exempted under § 44-1843 and including transactions exempted under § 44-1844, directly or indirectly to do any of the following:

1. Employ any device, scheme or artifice to defraud.

2. Make any untrue statement of material fact, or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

3. Engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit.

3. § 44-2004. Limitation of civil actions.
A. No civil action shall be maintained under this article to enforce any liability founded

upon a violation of §§ 44-1841 or 44-1842 unless brought within one year after such violation occurs.

B. No civil action shall be brought under this article to enforce any liability founded upon a violation of Article XIII [which includes § 44-1991] unless brought within one year after discovery of the fraudulent practice upon which the liability is founded, or after such discovery should have been made by the exercise of reasonable diligence, and in no event shall such action be brought more than three years after the fraudulent practice occurred.

or one year after discovery should have been made by the exercise of reasonable diligence, but in no event more than three years after the transaction complained of as to Count III (A.R.S. § 44–2004(B), supra).

Taking Count III first as to Redfern and the Bank, it could be found that Redfern's part in the deception, particularly from May to November of 1969, when Geiler made his continuing inquiry about the payment of the $30,000 note from Tanner, made either the actual or reasonable discovery of the fraudulent practice sometime in November, 1969. Since the complaint was filed in June 1970, the time clearly had not run as to Count III if such a fact is found.

As to Count II, the stock was unquestionably transferred in May of 1969, and the statute of limitations controls unless it was tolled or for some other reason cannot be raised as a bar to this action.

We believe the trial court could find facts supporting either the tolling of the statute (see A.R.S. § 12–501) or an estoppel to raise the statute, or both. Under any view of the facts, the complaint was filed within 30 days of the running of the statute of limitations. There is credible evidence that Tanner deliberately absented himself from the State of Arizona anywhere from 2 to 6 months during the approximately 13 months from May, 1969 to June of 1970. Whether or not service could have been effected by the long arm statute, (Rule 4(e)(2), Ariz.R.Civ.P., 16 A.R.S.) is a question of fact. *Graham v. Shooke,* 13 Ariz.App. 141, 474 P.2d 860, vacated on other grounds, 107 Ariz. 79, 482 P.2d 446 (1970). See also: *Brooks v. Southern Pacific Company,* 105 Ariz. 442, 466 P.2d 736 (1970).

A clearly permissible, if not overwhelming inference from the record, is that Tanner's wife, Jennifer Day Tanner, his son and his wife, and all the appropriate corporate entities involved in either the acquisition of or the transfer after acquisition of

the Cherry Creek Ranch property, were in the complete control, or under the total domination of Tanner. The depositions of Jennifer Day Tanner, Michael S. Tanner, and M. J. Tanner make this very clear. Thus, either under the general agency principles discussed, supra, or because of estoppel, infra, they can claim no better benefit from the statute than Tanner can. See: *Irwin v. Pacific American Life Insurance Co.,* 10 Ariz.App. 196, 457 P.2d 736 (1969); see also: 28 Am.Jur.2d § 33.

We think if the facts are all found against Tanner and family and companies, and Redfern and the Bank, which they may not be, an ample predicate for the application of the doctrine of estoppel would exist insofar as the claim of this short statute of limitations is concerned, particularly in view of the very short delay and the lack of prejudice in that delay.

This complex matter of estoppel is reviewed generally in Note, *Statute of Limitations—Estoppel,* 43 A.L.R.3d 429–495, and cases cited therein and supplemental thereto. For purposes of the case at bar, we deem three cases sufficient authority. In 1959, the U. S. Supreme Court gave new and vibrant emphasis to the doctrine in *Glus v. Brooklyn Eastern District Term.,* 359 U.S. 231, 79 S.Ct. 760, 3 L.Ed.2d 770 (1959). Justice Black's language is particularly appropriate:

"[T]he maxim that no man may take advantage of his own wrong . . . has frequently been employed to bar inequitable reliance on statutes of limitations." 359 U.S. at 232, 79 S.Ct. at 762, 3 L.Ed. 2d at 772.

The Second Circuit, in a recent case involving the sale of unregistered securities is also persuasive; *Katz v. Amos Treat & Co.,* 411 F.2d 1046 (2nd Cir. 1969). In holding the reliance upon the short, one year statute of limitations to be barred by the doctrine of estoppel, the court said:

"The case for doing this is particularly strong with a statute so short as § 13 [1 year]." 411 F.2d 1055.

Finally, although said in conjunction with the enforcement of a statute of limitations against a person mentally incompetent, we believe there is no reason to suspect that the foundation of the Arizona Supreme Court's language in *Brooks v. Southern Pacific Company,* supra, could not just as well have been the enforcement of the statute in favor of highly culpable defendants who actively conspired to keep an innocent plaintiff in the dark:

> "The policy underlying the statute of limitations is primarily for the protection of the defendant, and the courts, from litigation of stale claims where plaintiffs have slept on their rights and evidence may have been lost or witnesses' memories faded. This policy is sound and necessary for the orderly administration of justice. However, this policy may be outweighed 'where the interests of justice require vindication of plaintiff's rights'. [Citation omitted]." 105 Ariz. at 444, 466 P.2d at 738.

## CONCLUSION

As previously stated, this Court has expressed no opinion as to what ultimate facts may be found in this case by the trier of fact. We have only viewed the evidence in a light most favorable to the party against whom summary judgment was granted.

The judgment entered in favor of Redfern and the Arizona Bank, as to Count IV of the amended complaint is affirmed.

The judgment entered in favor of Redfern and the Arizona Bank as to Counts I, II and III of the amended complaint is reversed and remanded for trial.

The judgment entered in favor of Tanner, his wife, his son Michael S. Tanner and wife, Compass Realty and Investment Corporation, Jennifer Day Enterprises, Inc., and United Ranches Corporation, as to Count II of the amended complaint is reversed and remanded for trial.

HAIRE, C. J., and WREN, J., concur.